IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREW GILBLOM, | ) | |
|              Plaintiff | ) | |
| | ) | |
| vs. | ) | Civil Action No. 08-1672 |
| | ) | Judge Nora Barry Fischer/ |
| WARDEN GILLIPSIE; OFFICER COZART | ) | Chief Magistrate Judge Amy Reynolds Hay |
| OFFICER KRAUS; GREENE COUNTY, | ) | |
|              Defendants | ) | |

**REPORT AND RECOMMENDATION**

**I.  RECOMMENDATION**

The Court considers here the Motion for Summary Judgment [Doc. 15] filed by the Defendants in this action brought pursuant to 42 U.S.C. § 1983. It is respectfully recommended that the Motion be granted.

**II.  REPORT**

    **A.  Background**

The facts underlying this matter are straightforward and, for purposes of the pending Motion, undisputed. In May 2007, the Plaintiff, Andrew Gilblom, ("Gilblom" or "the Plaintiff"), was found guilty of driving under the influence, and sentenced in the Court of Common Pleas of Greene County, Pennsylvania to a term of imprisonment in the Greene County Jail ("the Jail"). He was to serve not less than ninety days, nor more than twenty-three and one-half months. (Doc. 17  Ex. A). On June 4, 2007, the sentencing order was modified to the extent that Gilblom was "granted leave to serve his Sentence on consecutive 48 hour weekends." (Id. Ex. B). Gilblom began to serve his sentence that month, reporting to the jail on Friday evenings after

6:00 p.m.

Jail Warden, Harry D. Gillispie ("Gillispie" or "the Warden")[1] testified in his deposition that those serving weekend sentences are met by a staff member and taken to the booking room for review of pertinent information, payment of a processing fee, and surrender of any contraband. (Id. Ex. F at 13). On his first visit, an inmate receives an explanation of the contraband policy, and is photographed and fingerprinted. He is also given a copy of the inmate handbook which specifies that violating institutional rules could result in detention beyond the scheduled release time, with the length of detention depending on the severity of the infraction. Jail policy provides that inmates are to "be out-processed as close as possible to the same time [they] are in processed." (Id. Ex. D).

On occasion, inmates have attempted to smuggle contraband into the jail in a body cavity. (Id. at 15). Where Jail personnel suspect that an incoming inmate is carrying contraband in his rectum, the inmate is required to "squat-and-cough and [if] nothing comes out, [they may be dry celled][2] to where when they defecate. [Jail officials] check their feces to see if there's any contraband in it." (Id. at 17). An individual in a dry cell is "normally" checked every two hours to seek if he needs a drink, or urine in the toilet needs to be flushed. On weekend midnight shifts, an officer checks dry-celled inmates every half hour. (Id. at 18-19).

The events described in Gilblom's Complaint took place over the weekend beginning on Friday, December 7, 2007. The Warden testified in his deposition that prior to that weekend he

---

[1] Warden Gillispie's name is misspelled in the case caption.

[2] A dry cell is one in which the water has been turned off at a source outside the cell. As a result, the toilet in the cell cannot be flushed by the inmate. (Doc. 17 Ex. I at 23).

received an anonymous phone call informing him that Gilblom intended to bring tobacco, a contraband substance, into the Jail. In addition, Gillispie monitored telephone calls made by inmates, and became convinced that "arrangements were being made for Gilblom to throw [tobacco] over the fence to the G Block housing unit." (Id. at 37). The Warden stated that he "hid outside the prison [one] evening and waited, and [the event] never materialized." (Id.) Information gleaned from subsequent telephone surveillance indicated that the inmates' plan was thwarted when they were "tipped off." ( Id.). Because he suspected that Gilblom might attempt to bring tobacco into the Jail by other means, the Warden ordered Jail staff to detain him when he reported to the Jail on December 7, "until he defecated and . . . the staff was able to check it." (Id. at 39). According to the Warden, this was normal practice in the circumstances. (Id. at 17).

Gilblom alleges that when he arrived at the Jail on the evening of December 7, Corrections Officer Cozart ("Cozart") was on duty. (Doc. 1 ¶ 24). Gilblom was strip searched. He was also told that "he was suspected of carrying contraband . . . and would be required to defecate before leaving the booking room." (Doc. 16 at 2). Gilblom states that he was then escorted into "the nurse's station and instructed to defecate into a wastebasket," which he refused to do. (Id.). After insisting that he be allowed to use a toilet, Gilblom was given access to facilities in the nurse's station while Cozart watched. Gilblom was unable to defecate, and was returned to the booking room with the understanding that he would be moved to a cell after defecating. (Doc. 17 Ex. C at 43).

That evening, Corrections Officer Kraus came through the booking room and laughed at Gilblom, telling him that he knew about the attempt to smuggle tobacco. Kraus also told Gilblom that he would contact the Warden to ensure that Gilblom was not released. (Id. at 47).

3

Gilblom did not have access to a toilet in the booking room, and was required to sleep on the floor with the lights on. (Id. at 47-48). Although officers came through the room hourly during the night, no one asked the Plaintiff whether he needed to use the toilet. (Id. at 49-50). In the morning of December 8, Gilblom ate breakfast in the booking room, and was told that if he needed to use the toilet, he should tell one of the guards. Later that morning, he was transferred to a dry cell. (Id. at 55-56). Kraus remembered telling the Warden that Gilblom had been placed in the dry cell because he had not defecated. (Doc. 17 Ex. G at 24). According to Kraus, the Plaintiff had not moved his bowels by the time Kraus's shift ended. (Id. at 28).

      Once in the dry isolation cell, Gilblom ate lunch and had a bowel movement. Gilblom's memory differs from Kraus's. According to Gilblom, Kraus was still on duty early Saturday afternoon and visited Gilblom's cell. Gilblom states that he told Kraus that he had been able to defecate, but Kraus refused to conduct an inspection. (Doc. 17 Ex. C at 65). The Plaintiff asked each officer who came to his cell throughout the afternoon to check his stool, but none of them did. (Id. at 66-67). After dinner on December 8, Gilblom had a second bowel movement. He requested that Cozart come to his cell, but when Cozart arrived, he refused to examine the stool. Gilblom requested a laxative, and also asked that he be allowed to see a doctor for a rectal exam. Cozart denied these requests. (Id. at 68-69). Through the night, Gilblom was unable to convince anyone to examine his stool. Early on the morning of December 9, Gilblom had a third bowel movement. Despite his repeated requests, guards refused to check his waste for contraband. ( Id. at 72).

      Gilblom was scheduled to be released at 7:00 p.m. on Sunday, December 9. When that time came, he was not released, and was not told why he was being detained, although he asked.

(Id. at 74-75).  On the morning of December 10, Corrections Officer Lacich ("Lachich") entered Gilblom's cell.  Gilblom "begged" Lacich to check his stool, explaining that as a result of his overstay, he was in danger of losing his job and his children.  (Id. at 75-76).  Lachich replied that examining the stool would make him ill.  He did, however, volunteer to hold a flashlight while the Plaintiff performed the search.  (Id. at 76-80).  Gilblom then "put his [bare] hands into the toilet and smashed the feces so that Lacich could see that there was nothing in them [sic]."  (Doc. 17 at ¶ 28).  Lacich then left the cell, turned on the water and brought Gilblom a bar of soap.  (Id.).

      A short time later, two unidentified officers entered the Plaintiff's cell, searching it, and strip searching the Plaintiff.  Sergeant Moss was summoned to the cell.  When she radioed Gillispie that no contraband had been found, Gillispie ordered that Gilblom be released.  Gilblom left the Jail at approximately 9:00 a.m. on December 10.  The "extra" fourteen hours that Gilblom spent in the Jail were credited to his overall sentence.  (Id. at ¶ 29-30, 32).

      In his Complaint, Gilblom alleges violation of his Eighth and Fourteenth Amendment rights.  He contends that his Eighth Amendment rights where transgressed by: (1) the deliberate deviation from his sentencing order for the purpose of inflicting punishment; (2) the Defendants' deliberate indifference to the safety threat posed by his thirty-six hours in a cell with an unflushed toilet; (3) the Defendants' threat of extended detention; and (4) the requirement that he search his own waste. (Doc. 1 at ¶¶ 44-46).  The Plaintiff next alleges that his rights under the Fourteenth Amendment were violated: (1) when his sentencing order was modified, depriving him of liberty without procedural due process; and (2) by a municipal policy or practice of altering court orders in the absence of procedural due process.  (Id. at ¶¶ 47-48).  Last, Gilblom

5

contends that he was subjected to unreasonable search and seizure in violation of the Pennsylvania Constitution when he was forced to defecate, not released in accordance with the terms of his sentencing order, and required to search his own feces in order to secure his release. (Id. at ¶ 49).

### B. Standard of Review

Summary Judgment is appropriate only where there are no genuine issues of material fact. Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, if the evidence, however, is "'merely colorable' or is 'not significantly probative,'" summary judgment may, nonetheless, be granted. Equimark Commercial Fin. Co. v. C.I.T. Fin. Serv. Corp., 812 F.2d 141, 144 (3d Cir.1987) (quoting Anderson, 477 U.S. at 249-50).

In evaluating the evidence, the court must view the facts and the inferences to be drawn therefrom in a light most favorable to the non-moving party. Anderson, 477 U.S. at 255. The burden of establishing that no genuine issue of material fact exists rests with the movant. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. When examining the record to see if there are genuine issues of material fact, the court's focus is on issue finding, not on issue resolution. With this standard in mind, the Court turns to the issues raised in the pending Motion.

### C. Discussion

1.      **The Eighth Amendment Claim**

Gilblom's Eighth Amendment claim has three components. He alleges that the Defendants, acting in their individual and official capacities,[3] subjected him to cruel and unusual punishment when they: (1) exhibited deliberate indifference to his health and safety by forcing him to remain in a cell with a toilet containing unflushed urine and feces; (2) created an atmosphere of coercion, forcing him to handle his own waste; and (3) threatened to and did deviate from his sentencing order, keeping him longer than forty-eight hours on three separate weekends.[4]  The Court addresses these arguments seriatim.

a.      **Claims Relating to Health and Safety**

"The Cruel and Unusual Punishments Clause of the Eighth Amendment proscribes 'punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society.'" Tillman v. Lebanon County Corr. Fac., 221 F.3d 410, 417 (3d Cir. 2000) (footnote omitted) (quoting Estelle v Gamble, 429 U.S. 97, 102 (1976)).  In order to establish an Eighth Amendment claim, a plaintiff must first prove "a sufficiently serious objective deprivation." Tillman, 221 F.3d at 418.  This objective component is narrowly defined. "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.  To the extent that such conditions are restrictive and even harsh, they are part

---

[3] Summary judgement should be granted as to the official capacity claims against the individual Defendants.  These claims are redundant in that suing these individuals in their official capacities is no different than naming the County multiple times. A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 581 (3d. Cir. 2002).

[4] Gilblom contends that on one occasion he was detained when Jail officials misplaced his records, and on another, he was taken to Jail during the week when his probation officer saw him in town and told him that if he wasn't working, he should be in Jail.  These other incidents are irrelevant to the arguments raised by Gilblom and to the Court's analysis.

of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). "[F]ederal courts have repeatedly held that the Constitution does not mandate that prisons provide comfortable surroundings or commodious conditions." Anders v. Gusman, No. 06-2898, 2009 WL 1269232 at * 4 (E.D. La. May 5, 2009) (citing Talib v. Gilley, 138 F.3d 211, 215 (5th Cir. 1998)). Only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. Hudson v. McMillian, 503 U.S.1, 9 (1992). A prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need." Wilson v. Seiter, 501 U.S. 294 (1991) (citing Rhodes, 452 U.S. at 347). These needs include "food, clothing, shelter, sanitation, medical care and personal safety." Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir.1997).

Whether the required showing has been made depends on a number of factors "includ[ing] the length of confinement, the amount of time prisoners must spend in their cells each day, the opportunities for activities outside the cells, and the repair and functioning of basic physical facilities such as plumbing, ventilation and showers." Tillery v. Owens, 907 F.2d 418, 427 (3d Cir.1990). "The Court may also consider the extent of any injury actually incurred." Lane v. Culp, Civ. No. 05-576, 2007 WL 954101, at *5 (W.D. Pa. March 28, 2007) (citing Cowans v. Wyrick, 862 F.2d 697, 700 (8th Cir.1988)).

In addition to meeting the objective standard of deprivation, a Plaintiff seeking to establish an Eighth Amendment claim must demonstrate that "a prison official subjectively acted with a sufficiently culpable state of mind, i.e., deliberate indifference." Tillman, 221 F.3d at 418. This subjective component is also narrowly construed. A Defendant's conduct violates the

Eighth Amendment "only if he knows that the inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994).

In an effort to establish the objective component of an Eighth Amendment violation, Gilblom argues that he was exposed to conditions as serious as those held sufficient in Young v. Quinlan, 960 F.2d 351 (3d Cir.1992), superceded by statute on other grounds as stated in Ghana v. Holland, 226 F.3d 175, 184 (3d. Cir. 2000). The Court of Appeals characterized the prison conditions to which Young was subjected over a five month period as "wretched" and described his incarceration as "a violent ordeal." Id. at 353. As soon as Young was placed in a cell, his cellmate demanded sex. When Young refused, he was assaulted and threatened with death if he reported the incident. His requests to be moved were denied, and he endured continued physical abuse and threats on his life.

Although he was ultimately relocated, Young's new cellmate also assaulted him, demanded sex, and threatened to kill him if he alerted authorities. Nonetheless, Young, on at least six occasions, asked to be moved. After these requests were denied, Young was threatened with a razor blade for refusing sexual advances. When he took measures to prevent his cellmate from returning to the cell, Young was moved, but was given a disciplinary report.

The day after the disciplinary hearing, he was assaulted by a third cellmate. With a razor blade held to his throat, Young was forced to perform oral sex and was threatened with rape. Young's requests for help were ignored. The cell mate then ordered Young to flood the cell. Afraid, Young complied. As a result, Young was placed in a dry cell for the next ninety-six hours. He was denied toilet paper, could not wash his hands before eating, and was not given

access to a shower. Throughout this time, he suffered from diarrhea. He was denied a blanket, though prison officials relented when Young told them that he was HIV positive and did not want to catch cold. Young was forced to urinate and defecate in a corner of the cell, and was told that if he became disruptive, he would be chained to a steel slab indefinitely. After twenty nine hours with no access to facilities, Young was given a plastic urinal, but multiple requests to be taken to the toilet were ignored. He continued to defecate in the cell for three days. The inmate assigned to clean Young's cell refused, "because of the stench." Id. at 354.

After his time in the dry cell, Young was housed next to the inmate who had sexually assaulted him. His requests for protective custody were ignored, and Young attempted suicide. He ultimately served the remainder of his sentence at another facility.

Gilblom's argument that "[t]he conditions imposed on [him] are as serious as [those] imposed on Young, " is based on serious distortion of the record. Gilblom's treatment was not remotely comparable to that endured by Young. In fact, the record fails to show that Gilblom suffered any serious objective deprivation.[5] Arguing that he has made the objective showing essential to an Eighth Amendment claim, Gilblom cites first his overnight stay in the Jail's booking area. He alleges that he was "locked in a room without a toilet [,] forced to sleep on the floor with the lights on," and "held without free access to a place to urinate." (Doc. 20 at 8). These allegations are vastly overstated.

First, it is clear that Gilblom understood why he was being held in the booking room, and the record does not show that he protested. He was told that he would be moved from the

---

[5]The fact that Gilblom chose to rely on a case so vastly dissimilar to his own suggests to the Court that he was unable to locate authority recognizing an Eighth Amendment violation in circumstances less extreme than those described in Young.

booking room as soon as he defecated, and that he could given access a toilet by asking one of the guards who passed frequently and regularly through that room. (Doc. 17 Ex. C at 55). Gilblom does not allege that he was denied - or even requested - use of the facilities, that the room was unsanitary, or that he was exposed to any risk of harm while he was there.

Gilblom next alleges that his health and safety were threatened when he was moved to a dry cell where he was exposed for less than forty-eight hours - from about noon on Saturday until about 9:00 Monday morning - to the "revolting" "stench caused by his own excrement." (Doc. 20 at 9). According to Gilblom, the proximity to an unflushed toilet posed an objectively serious threat to his health and safety. This argument lacks merit.

The Court accepts that the odor caused by excrement in the dry toilet was intensely unpleasant, and that the officers' alleged refusal to examine it was inexcusable. It does not find, however, that there was any credible threat to Gilblom's health or safety. The total period of his exposure to the challenged conditions as a whole amounted to less than two and one-half days, and his exposure to the smell of his own waste was limited to less than thirty-six hours. Given this narrow time frame, the conditions underlying a viable Eighth Amendment claim would have to have been horrific. They were not. Case law interpreting the Eighth Amendment illustrates how far short Gilblom's claims falls.

The Court turns first to cases recognizing viable Eighth Amendment claims. These decisions describe conditions far more extreme than those detailed by Gilblom. See, e.g. McKeithan v. Beard, No. 08-1746, 2009 WL 908710, at * 4-5 (3d Cir. April 6, 2009) (objective component of Eighth Amendment claim met where plaintiff was housed next to psychotic inmates who smeared themselves with feces and stood at cell door, placed feces in air vents,

11

flooded tier with waste, and banged endlessly on sinks) (citing Vinning-El v. Long, 482 F.3d 923, 925 (7th Cir. 2007) ( recognizing claim where plaintiff described floor covered with water, a broken toilet, feces and blood smeared on the wall, and no mattress); and McBride v. Deer, 240 F.3d 1287, 1292 (10th Cir. 2001) (upholding Eighth Amendment claim where inmate was forced to remain in feces-covered cell for three days)); Despain v. Uphoff, 264 F.3d 965 (10th Cir. 2001) (finding violation of Eighth Amendment where, for thirty-six hours, water overflow after riot flooded unit to standing depth of four inches, prisoners urinated into the water in which feces and uneaten food floated, water was nearly even with bottom of food carts, toilets would not flush, and inmate was afraid to eat); McCord v. Maggio, 927 F.2d 844, 848 (5th Cir.1991) (finding Eighth Amendment violation where prisoner was forced to live and sleep for two years in unlit cell with sewage back up and roach infestation); Fruit v. Norris, 905 F.2d 1147, 1151 (8th Cir. 1990) (forcing inmates to work in a shower of human excrement without protective clothing and equipment violated Eighth Amendment); Alvarez v. County of Cumberland, No. 07-346, 2009 WL 750200, at* 5 (D. N.J. March 18, 2009) ( plaintiff, who spent three days in isolation cell where toilet overflowed with feces, urine, and other materials, contracted MRSA in his groin showing exposure to feces).

Decisions in which courts have found that the Eighth Amendment was *not* violated are just as instructive. See e.g., Wheeler v. Walker, No. 08-1898, 2008 WL 5232802 (7th Cir. Dec. 16, 2008) (rejecting Eighth Amendment claim where prisoner alleged that during two week period he had only thin blanket to protect him from the frigid air entering unheated cell through window with broken latches, roaches crawled over him while he tried to sleep on badly torn mattress, urine and waste "encrusted" sink and toilet, trash, dirt, and debris covered floors, walls,

and sink, and stench of waste came from broken toilet); Davis v. Scott, 157 F.3d 1003, 1004 (5th Cir.1998) (three day placement in cell with blood on walls and excrement on floors did not meet Eighth Amendment's objective component); Smith v. Copeland, 87 F.3d 265, 268 (8th Cir.1996) (four day confinement in cell with overflowing toilet causing stench of feces and urine not Eighth Amendment violation); Whitnack v. Douglas County, 16 F.3d 954, 958 (8th Cir.1994) (stating that intolerable conditions lasting twenty-four hours did not constitute Eighth Amendment violation); Schaeffer v. Schamp, No. 06-1516, 2008 WL 2553474, at *6 (W.D. Pa. June 25, 2008) (placement in hard cell for ten days without mattress, soap, toilet paper, running water, legal supplies, prescription medication, and food other than one meal a day insufficient to state Eighth Amendment claim); Wilson v. Schomig, 863 F. Supp. 789, 794-95 (N.D. Ill.1994) (ruling that absent showing of physical harm, fact that inmate slept on urine and feces-stained mattress in dirty, roach-infested, leaky cell did not state Eighth Amendment claim).

Even the case cited in the introduction to his argument, LaReau v. MacDougall, 473 F.2d 974 (2d Cir. 1972), undercuts Gilblom's Eighth Amendment claim. In LaReau, the Court wrote: "Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted . . . In order to preserve the human dignity of inmates and the standards of humanity embraced by our society, we cannot sanction such punishment." Id. at 978. This statement was made, however, on radically different facts. There, an inmate was confined in a strip cell with cement walls and floors, and lighting which:

> for substantial periods of time [left him] in almost total darkness [and] in total silence since the walls and door did not permit transmission of sound. The cell contained no sink, water fountain, or commode [and] the only facility for disposing of human waste was . . . a hole in the floor in the corner of the cell covered with a grate. It was flushed with water from a manually-controlled valve

operated from *outside* the cell.

Id. at 977.  In addition, the inmate was denied reading material except for a Bible, and had no one to talk to or communicate with in any way, except that he was permitted to write.  Id.  The Court stated that the conditions to which the inmate was exposed "went beyond mere coerced stagnation," "threatening his sanity and severing his contacts with reality by placing him in a dark cell almost continuously day and night." Id. at 978.  Finally, the Court observed that "[e]ven if the strip cell could be justified for serious offenses, it was a grossly severe penalty' for possessing contraband."  Id. at n. 6.  Thus, although proximity to excrement was a factor in LaReau, it was only one of multiple execrable conditions faced by the plaintiff.  Nothing in LaReau suggests that the Court there would have found an Eighth Amendment violation in the relatively benign circumstances faced by Gilblom.

In sum, the Court does not find any support in the case law for the proposition that Gilblom's time in the booking room or his proximity to an unflushed toilet in a dry cell for less than forty-eight hours worked a serious objective deprivation of the minimal civilized measure of life's necessities for purposes of the Eighth Amendment. This conclusion is not altered by Gilblom's argument that the Defendants forced him to handle his own feces.  The Court can well understand Gilblom's frustration and his feelings of anger and impotence at being detained in the face of officers' refusal to examine what he knew to be exculpatory evidence.  The record does not suggest, however, that Gilblom was placed in a situation where he was left with no reasonable alternative to handling his feces.  None of the evidence shows that Gilblom exhausted options that would have spared him exposure to his own waste.  For example, the Plaintiff alleges that Officer Lacich was sympathetic, stating "that he was sorry, that he knew it wasn't

right what was going on, but there's nothing he could do about it and he could not search the feces but he would hold a light while [Gilblom] did it." (Doc. 17 Ex. C at 79).  Lacich did not push Gilblom to reach into the toilet,  provide instruction as to how the examination should take place, and did not discuss the degree of examination necessary.  Before reaching into the toilet, Gilblom did not ask to make a phone call or to have a call placed.  He did not ask Lachich to contact the warden, a superior officer, or medical personnel.  He did not seek to clarify the alternatives to his undertaking the examination, and did not ask for gloves, a plunger, or other implement that would have allowed him to avoid manual manipulation.

Finally, the evidence does not show that the Warden knew that Gilblom remained in the Jail past his release time or knew any of what transpired over the weekend.  The evidence also fails to show that any of the Defendants were aware of a risk that Gilblom would take the extreme action he describes.  Accordingly, the Court finds that the record is devoid of evidence that the Defendants were deliberately indifferent to a known risk to Gilblom's health or safety.

 The Court does not find that the conditions to which Gilblom was exposed were sufficient to establish either element of an Eighth Amendment violation.

### b. Claims Relating to Detention and Threats of Detention

The Plaintiff next contends that his Eighth Amendment rights were violated when he was detained for fourteen hours beyond the weekend term specified in his sentencing order.  (Doc.1 ¶¶ 44, 45).[6]  This claim is not addressed in the Plaintiff's brief.  Accordingly, the Defendants

---

[6]At the time of Gilblom's sentence, partial confinement was authorised by the terms of 42 Pa. Cons. Stat. Ann. § 9755(a): "In imposing a sentence involving partial confinement the court shall specify at the time of sentencing the length of the term during which the defendant is to be partially confined, which term may not exceed the maximum term for which he could be totally confined, and whether the confinement shall commence in a correctional or appropriate institution." Pennsylvania law also provided that "the person in charge of a jail" had authority to "refuse to permit the prisoner to exercise his

devote scant attention to it, contending summarily that the overstay did not inflict a deprivation severe enough to implicate the Eighth Amendment. The parties do not cite authority for their respective positions, and the Court's own research reveals a dearth of case law addressing the Eighth Amendment implications of a weekend overstay that does not extend the overall sentence. Nonetheless, the Court is guided in its analysis of this aspect of Gilblom's claim by cases discussing Eighth Amendment claims raised in the context of detention beyond an inmate's maximum sentence.

Even where a plaintiff has been detained beyond the term of his sentence - a deprivation far more consequential than the one alleged here - it is "extremely rare" for such detention to amount to an Eighth Amendment violation. Moore v. Tartler, 986 F.2d 682, 686 n.5 (3d Cir. 1993). Cases in which an Eighth Amendment claim has been recognized in the context of an overstay involve significant periods of time. See, e.g., Shorts v. Bartholomew, No. 06-5877, 2007 WL 3037268 (6th Cir. Oct.17, 2007) (plaintiff stated Eighth Amendment claim where he was held for 218 days beyond expiration of sentence); Sample v. Diecks, 885 F.2d 1099 (3d Cir. 1989) (finding violation where officials' miscalculation caused inmate to serve nine months and eight days beyond his maximum sentence); Alston v. Read, - - F. Supp.2d  - -, No. 07-0026, 2010 WL 144868 (D. Hawaii Jan.14, 2010) (145 day overstay sufficient to state Eighth Amendment claim); Campbell v. Ill. Dept. of Corr., 907 F. Supp.1173 (N.D. Ill. 1995) (same where plaintiff was incarcerated for two years beyond end of sentence).

Courts addressing shorter periods of overstay have held that the harm incurred is not

---

privilege to leave the jail for a period not to exceed five days for any breach of discipline or other violation of regulations of the county correctional institution." 61 Pa. Cons. Stat. Ann. §1756 (previously codified at 61 Pa. Stat. Ann. § 2145).

sufficient to implicate the Eighth Amendment.  See, e.g., Calhoun v. N.Y. State Div. of Parole Officers, 999 F.2d 647, 654 (2d Cir. 1998) (Eighth Amendment objective element not satisfied by incarceration for five days beyond maximum term); Brims v. Burdy, 03-civ-3159, 2004 WL 1403281, at * 2 (S.D.N.Y. June 23, 2004) (stating that "[a]lthough the circumstances surrounding [the plaintiff's] prolonged incarceration are unfortunate, his extra six days of imprisonment is [sic] not a harm of sufficient magnitude to implicate the Eighth Amendment"); Ostendorf v. Dawson County Corr. Bd., No. 4:98CV3039, 2002 WL 31085085, at *12 (D. Neb. Sept. 18, 2008) ("four day delay did not amount to cruel and unusual punishment"); Herron v. Lew Sterrett Justice Ctr, No.3: 07-CV-0357-N, 2007 WL 2241688, at * 3 (N.D.Tex. Aug. 6, 2007) ("[u]nauthorized confinement for thirty-one days not harm of constitutional magnitude"); McCants v. Jones, No. 98- cv- 6337, 1999 WL 804009 (W.D.N.Y. Sept. 30, 1999) ( extra six days of imprisonment not cognizable under Eighth Amendment).  If the days at issue in these cases were insufficient to state a claim, the same conclusion applies with respect to Gilblom's hours-long overstay.

        **b.**     **Due Process**

The Due Process Clause of the Fourteenth Amendment provides that no "State shall deprive any person of life, liberty, or property, without due process of the law."  U.S. Const. Amend. xiv § 1.  "A protected liberty interest may arise from only one of two sources: the Due Process Clause or the laws of a state."  Asquith v. Dept. of Corr., 186 F.3d 407, 409 (3d Cir. 1999) (citing Hewitt, 459 U.S. 460, 466 (1983), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472, 483 (1995)).  Gilblom bases his due process claim exclusively on the Constitution: "Gilblom's 14 hour holdover outside of his forty-eight hour partial sentence term

17

violates his procedural due process *rights inherent in the U.S. Constitution*." (Doc. 20 at 13) (emphasis added).

As a general rule, " prisoners under confinement do not have inherent liberty interests in particular modes, places, or features of confinement." Bacon v. Minner, No. 06-3594, 2007 WL 1157138, at * 1 (3d Cir. April 19, 2007) (citing Hewitt 459 U.S. at 466-68 (1983)). The Supreme Court has held repeatedly that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not itself subject an inmate's treatment by prison authorities to judicial oversight." Hewitt, 459 U.S. at 468.[7]

The situation presented here lies squarely within the parameters of this rule. Gilblom's overstay did not violate the Eighth Amendment, and is not alleged to have violated any other constitutional provision. It is also undisputed that the overstay did not extend Gilblom's sentence beyond the term imposed.[8]

Because the Court concludes that Gilblom did not establish deprivation of a liberty

---

[7]The Plaintiff fails to cite any case in which a court has held that detention beyond a weekend term implicates a liberty interest. His due process claim rests on the assertion that "[t]he informal process required to change an individual's sentence from a forty-eight hour incremental sentence to a continuous sentence should mirror the process for a parole revocation." (Doc. 20 at 14). This analogy to parole revocation proceedings, see e.g., Morrissey v. Brewer, 408 U.S. 471 (1972), is based on the flawed premise that Gilblom's ability to serve his sentence in increments was jeopardized. This was not the case. *This matter involves one fourteen hour overstay*. Because Gilblom was never in danger of losing an interest remotely comparable to that associated with parole, his reliance on case law dealing with due process in the context of parole revocation is misplaced.

[8]Because the Court finds that Gilblom did not suffer deprivation of a constitutional right, it need not reach his municipal liability claim. The Court does note, however, that even had it found that Gilblom's constitutional rights were violated, the record evidence is altogether insufficient to establish a municipal policy or practice of deliberate indifference to the rights of inmates. This showing is, of course, required in order to establish municipal liability in a section 1983 action. See Monell v. Dept. of Soc. Serv. of the City of New York, 436 U.S. 658, 690-94 (1978).

interest grounded in the Due Process Clause of the Fourteenth Amendment, it need not and does not discuss the record evidence bearing on the issues of deliberate indifference or qualified immunity.

### c. The Search and Seizure Claim Based on the Pennsylvania Constitution

Last, Gilblom contends that his right to be free from unreasonable search and seizure as guaranteed by Article I § 8 of the Pennsylvania Constitution was violated by the "methods used to force him to defecate, by delaying his release until he defecated, and by forcing him to search through his own feces to secure his release." (Doc.1 at ¶ 49). The Defendants challenge the viability of this claim, noting that "the prevailing view is that Pennsylvania does not recognize a private right of action for damages in a suit alleging violation of the Pennsylvania Constitution." Farrell v. County of Montgomery, Civ. No. 0593, 2006 WL 166519, at * 1 (E.D. Pa. Jan. 18, 2006). See also Pollarine v. Boyer, 2005 WL 1806481, at *2 (E.D. Pa.. July 29, 2005) (stating that Pennsylvania lacks statutory equivalent to 42 U.S.C. § 1983, and thus does not provide private cause of action for state constitutional violation); Morris v. Dixon, No.Civ. A. 03 CV 6819, 2005 WL 950615 (E.D. Pa. April 20, 2005) (same); Kaucher v. County of Bucks, No. Civ.A.03-1212, 2005 WL 283628 (E.D. Pa. Feb.7, 2005) (same). The Plaintiff's brief is silent with respect to this claim, and he has made no effort to distinguish between his request for damages and his request for other relief. Thus, the Court does not find any ground upon which to deviate from the prevailing view of Pennsylvania law.

### III. CONCLUSION

For the reasons set out above, the Court recommends that the Defendants' Motion for Summary Judgment [Doc.15] be granted in its entirety.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.D.2 B, the parties are permitted to file written objections in accordance with the schedule included in the docket entry reflecting the filing of this Report and Recommendation. Any response to objections may be filed in accordance with Local Civil Rule 72.D.2.

        Respectfully submitted,

        /s/ *Amy Reynolds Hay*
        Chief United States Magistrate Judge

Dated: 6 April, 2010

cc: All Counsel of Record via CM-ECF